Cite as 2023 Ark. 90

# SUPREME COURT OF ARKANSAS
No. CR-22-498

| | | |
|---|---|---|
| | | Opinion Delivered: May 25, 2023 |
| DAVID SHAUN WHITE | | |
| | APPELLANT | APPEAL FROM THE YELL COUNTY CIRCUIT COURT, NORTHERN DISTRICT [NO. 75NCR-20-65] |
| V. | | |
| STATE OF ARKANSAS | | |
| | APPELLEE | HONORABLE JERRY D. RAMEY, JUDGE |
| | | AFFIRMED. |

**SHAWN A. WOMACK, Associate Justice**

David White was convicted of first-degree murder for the killing of Steven Burchett on January 28, 2022, and was sentenced to life imprisonment as an habitual offender. He now appeals his conviction, raising nine points on appeal. Five arguments are not preserved for our review, and the other four have no merit. We affirm the conviction.

## I.     *Background*

On June 3, 2020, Burchett and a man named Jeremy Johnston left in Burchett's SUV from Harkey's Valley and went to White's in-laws' house to pick up money that White's wife, Jesse Kendrick, owed Burchett. White and Kendrick rode with Burchett and Johnston to meet Mike Baker in Dardanelle to get Kendrick's Social Security card so that she could get Burchett's money. Burchett drove, Johnston rode in the front passenger seat, Kendrick in

the rear passenger seat behind Johnston, and White in the rear passenger seat behind Burchett.

On the way to meet Baker, White told Burchett to turn down a road so that he could check a mailbox at a property Baker owned where he was expecting to receive his stimulus check. As Johnston got out of the SUV on the front passenger side to check the mailbox, he heard tires rolling over gravel. He turned around and saw that White had pulled Burchett over the top of the driver's seat and into the back seat of the Yukon.

The Yukon was rolling forward because Burchett had not shifted it into park before White pulled him into the back seat. Johnston jumped in to shift the Yukon into park, but Kendrick cut him with a knife before he could do so. Kendrick shifted the Yukon into park and got out of it with a gun and a knife.

As Johnston made his way around the Yukon, he approached the back passenger door on the driver's side. Upon arriving, he witnessed White standing over Burchett, who lay face down in the back seat with his legs dangling out of the open door onto the running board. White held a knife to him with his hands gripped tightly around Burchett's throat. Despite Burchett's attempts to free himself, White pinned him down and stabbed him with the knife.

White shouted, "You're dying [expletive]," and "You're dead, old man." After he killed Burchett, White said, "[T]hat's what you get for talking [expletive] to us." White then proceeded to search through Burchett's pants and truck. He managed to retrieve Burchett's wallet, which contained one hundred dollars and then attempted to wrap the body in a tent. However, White became frustrated with the task and eventually abandoned it. He then

2

pointed his knife at Johnston and ordered him to assist with dragging the body about seventy-five yards toward a discarded refrigerator on the property. White forcefully placed Burchett's body inside the refrigerator and slammed the door shut. He then demanded that Johnston accompany them, and together they departed in Burchett's Yukon. Kendrick took the wheel with Johnston seated beside him, and White, still holding the knife, occupied the rear passenger seat behind Johnston.

They then made a series of stops for various reasons. First, they headed toward an old bridge to dispose of certain objects in the river and attempted to cleanse the bloodstains from the Yukon. Second, they traveled to Dardanelle to meet with Baker and obtain Kendrick's Social Security card. Next, they went to New Blaine to acquire drugs from friends who were camping in the area and then proceeded to Burchett's camper, located in Harkey's Valley, where they obtained heroin. Then they drove back to White's in-law's residence to obtain a bag of clothing for White and Kendrick, and they crossed over Petit Jean Mountain en route to Conway. Once in Conway, they ran the vehicle through a car wash to discard additional items and scrub out the Yukon's interior before stopping at White's friend's home to purchase marijuana.

Their next destination was Clinton, where they pulled over at a residence, and White exchanged a firearm for methamphetamine. Following this, they headed north toward Omaha, located near the Missouri state border, and they stopped at Harley Fryer's house, where White asked Fryer to fix the knife he had utilized to murder Burchett. Fryer was unable to comply and handed the weapon back to White. Later on, while White was

3

momentarily distracted and had set the knife down, Johnston discreetly picked it up and left it resting on the bed rail of a truck that was parked on Fryer's property.

The following day also involved a series of stops. First, they drove to A.J. Navarro's house to get more meth. Second, they drove to Harrison and stopped at White's brother's house for a few hours before making a trip to Walmart. From Harrison, they drove back to Dardanelle, where they arrived at around 6:00 that evening. They stopped at a gas station in Dardanelle, and while White was inside the store, Johnston called his grandmother to pick him up. Johnston's grandmother took him to Baker's house, and he told Baker to call the police. Johnston then met law enforcement officers at Baker's property, where White had killed Burchett, and led them to the refrigerator containing Burchett's body. Then, with Johnston's assistance, law enforcement discovered the knife used to kill Burchett at Fryer's home. Ultimately, White was found by police hiding in the woods at his in-laws' house and was arrested.

In an interview on June 5, 2020, White initially denied any involvement in Burchett's murder. He claimed that he dropped Burchett off in Pottsville, went on to Conway without him, and never heard from him again. He also claimed that the cuts on his hand were "from the lawnmower." On June 7, 2020, the Yell County jail detention officers found White crying on the floor of a holding cell. He then proceeded to tell the officers that he had killed somebody and that it had "happened so fast." He did not say at that time that anyone had attacked him or that he had acted in self-defense.

4

Then, on June 8, White asked to talk to the police again. He confessed to killing Burchett but claimed he had "reacted badly in self-defense." He said that when they stopped to check the mailbox at Baker's property, he put his hand on Burchett's shoulder and told him they could not pay him. According to White, Burchett then cut him with a knife he had in his hand, and White "flipped out" and "grabbed [Burchett's] hand, and . . . started stabbing [Burchett] with it."

An autopsy determined that the manner of Burchett's death was homicide caused by multiple sharp-force injuries--three cuts, and eight stab wounds. Burchett's body had two cuts underneath the chin and on the front of the neck and one on the arm near the right elbow. There were two stab wounds on the right, front part of the neck; one had caused a thyroid cartilage fracture. There were three additional stab wounds in other areas of the neck--one had penetrated through the skin and soft tissues of fat and muscle, hitting the spine. The other two stab wounds on the neck had been inflicted from above and from the side and downward. There were two stab wounds to the chest; the larger of the two measured over three inches deep and penetrated through the ribs into the left chest cavity in the area where the left lung is. The second stab wound was on the lower right abdomen and measured about four inches deep. Additionally, there were rib fractures that may have been inflicted after Burchett died because there was no hemorrhage in the area surrounding the soft tissue. According to the medical examiner, the injuries Burchett sustained would have led to death by asphyxia, bleeding out, or both.

White testified on his own behalf at trial. His version of the events surrounding Burchett's death was largely consistent with the State's evidence, although he claimed he had acted in self-defense. He said Burchett cut him on his index finger with a small, 1.5-to-2-inch-blade pocketknife, after which he pulled Burchett over the driver's seat and into the back seat of the Yukon. He alleged that Burchett had cut himself "back to front" with the pocketknife in his own hand when he pulled Burchett over the driver's seat and ultimately pushed him face down into the backseat floorboard. He then twisted Burchett's arm behind him and stuck the pocketknife in the seat. After that, he got out of the Yukon, walked over to Johnston, and asked, "What the hell is going on, dude?" Then, he walked back to the Yukon and saw that Burchett had managed to push himself up off the backseat floorboard, "maybe eight to ten inches[.]" He pushed Burchett back down and wrestled with him again over the pocketknife. Finally, he elbowed Burchett in the ribs as hard as he could. He heard Burchett's ribs break, after which Burchett "rattled out and died."

He dumped Burchett's body in a refrigerator, took one hundred dollars from Burchett's wallet, and went to get high. He admitted that the cut on his finger was not life-threatening. He also admitted that he could have opened the car door and gotten away from Burchett. Additionally, he admitted that Burchett posed no direct threat to him when he walked back to the Yukon and hit Burchett in the ribs. He also admitted that he never made any calls to 911, or to anyone else, for help.

Appellant now appeals, raising nine points for reversal.

## II.    *Discussion*

The nine arguments that appellant raises are (1) there was insufficient evidence for White's murder conviction because the State failed to negate his justification defense beyond a reasonable doubt; (2) there was insufficient evidence for first-degree murder; (3) the trial court abused its discretion by admitting the portion of Johnston's statement alleging that White "beat the crap out of Brandy May"; (4) the trial court abused its discretion by rejecting White's proffered justification instructions and instead instructing the jury on a duty to retreat that no longer existed; (5) the trial court improperly restricted White from rebutting the State's assertion that his flight was evidence of consciousness of guilt rather than fear of retaliation by Burchett's associates; (6) the trial court improperly restricted White from presenting his justification defense by refusing to let him testify to Burchett's prior violent acts that were known to him at the time of the offense; (7) the trial court erred by allowing the prosecutor to misstate the law regarding parole eligibility to the jury; (8) the trial court erred in determining White to be an habitual offender when the State never included an allegation of such in the information; (9) the trial court abused its discretion by admitting irrelevant, overly prejudicial photos of Burchett's body.

### A. Unpreserved Claims

As a threshold matter, we summarily reject arguments one, two, three, five, and seven as they are not preserved.  Further, we caution White's appellate attorney from presenting nine points on appeal when more than half of them are unpreserved.

### 1. *Arguments one and two*

7

Appellant's first two arguments contest the adequacy of the evidence that led to his conviction for first-degree murder. He claims that the proof that he intentionally caused Burchett's death was insufficient because the State did not disprove his legitimate use of lethal force against Burchett.

To preserve a challenge to the sufficiency of the evidence on appeal, the defendant must make a specific motion for a directed verdict at the close of the State's case and again at the close of all the evidence. *E.g.*, *Dickey v. State*, 2016 Ark. 66, at 3–4, 483 S.W.3d 287, 289; Ark. R. Crim. P. 33.1(a) & (c). A defendant's failure to renew his directed-verdict motion at the close of any rebuttal case that the State may present operates as a waiver of any question relating to the sufficiency of the evidence to support the jury's verdict. *E.g.*, *King v. State*, 338 Ark. 591, 595–96, 999 S.W.2d 183, 185–86 (1999).

Rule 33.1 is strictly construed; a motion for a directed verdict must be specific enough to apprise the trial court of the basis for the motion. *Dortch v. State*, 2018 Ark. 135, at 6–8, 544 S.W.3d 518, 522–23. "We will not address the merits of an appellant's insufficiency argument where the directed-verdict motion is not specific." *Gillard v. State*, 372 Ark. 98, 101, 270 S.W.3d 836, 839 (2008). A defendant is bound by the scope and nature of his directed-verdict motion at trial and cannot change the grounds on appeal. *Kinsey v. State*, 2016 Ark. 393, at 9, 503 S.W.3d 772, 778.

During the trial, White moved for a directed verdict after the State had presented its case, arguing that the State had not proved beyond a reasonable doubt that he had intended to kill Burchett and had not provided evidence to rule out the existence of justification. He

8

repeated this argument after the defense rested its case, claiming that Johnston did not see the beginning of the altercation and could not have identified the initial aggressor. However, he did not renew his directed-verdict motion after the State presented a rebuttal witness, Officer Scott Moore. As a result, by not renewing his motion at the end of all the evidence, he waived his right to challenge the sufficiency of the evidence supporting his conviction, so we will not consider these arguments on appeal.

### 2. *Arguments three and five*

In his third claim, White argues that the trial court abused its discretion by allowing a part of Johnston's recorded police interview to be presented in which he referred to an incident where White purportedly "beat the hell out of [Brandy May]." He asserts that the trial court erred by not excluding the statement under Ark. R. Evid. 404(b) since it was introduced to depict him as a person of ill repute. Alternatively, he contends that the statement should have been excluded as excessively prejudicial under Ark. R. Evid. 403.

White's fifth claim is that the trial court improperly restricted White from rebutting the State's assertion that his flight was evidence of consciousness of guilt rather than fear of retaliation by Burchett's associates.

Appellant did not raise either argument in the trial court. Therefore, his arguments are not preserved, and we are precluded from addressing them here. *See Hamilton v. State*, 348 Ark. 532, 537–38, 74 S.W.3d 615, 618 (2002) ("The contemporaneous-objection rule requires a party's objection at the trial level to preserve an argument for appeal.").

### 3. *Argument seven*

9

White's seventh argument is that the trial court erred by allowing the prosecutor to misstate the law regarding parole eligibility to the jury. The prosecutor cautioned the jury against sentencing White to a term of years because "when he reaches 70 percent of that amount, he is eligible for parole and released back into society." The prosecutor effectively implied that White would only serve the minimum sentence allowed by law rather than possibly being parole eligible at that time.

White admits that this issue is not preserved, but requests that we apply the third exception to the contemporaneous-objection rule set out in *Wicks v. State*, 270 Ark. 781, 782–87, 606 S.W.2d 366, 367–70 (1980). This exception deals with the trial court's duty to intervene, without an objection, and correct a serious error either by an admonition to the jury or by ordering a mistrial. *Id.* The third exception is limited to only those errors affecting the very structure of the criminal trial, such as the fundamental right to a trial by jury, the presumption of innocence, and the State's burden of proof.

Here, there is no basis for us to apply the third *Wicks* exception to the prosecutor's closing argument since this does not affect the very structure of the criminal trial, such as the fundamental right to a trial by jury, the presumption of innocence, and the State's burden of proof. *See Fields v. State*, 2019 Ark. App. 162, at 5–8, 574 S.W.3d 201, 207–08 (holding no basis to apply third *Wicks* exception or to reverse sentences on the basis of prosecutor's comments regarding parole eligibility during sentencing-phase closing argument). Therefore, since this issue is not preserved and no exceptions apply, we will not consider this argument.

## B. Preserved Claims

### 1. *Argument four*

Appellant's fourth point on appeal is that the trial court abused its discretion by rejecting White's proffered justification instructions and instead instructing the jury on a duty to retreat that no longer existed.

This court will not reverse a trial court's refusal to submit an instruction to the jury absent an abuse of discretion. *Grillot v. State*, 353 Ark. 294, 318, 107 S.W.3d 136, 150 (2003). "Abuse of discretion is a high threshold that does not simply require error in the trial court's decision, but requires that the trial court act improvidently, thoughtlessly, or without due consideration." *Grant v. State*, 357 Ark. 91, 93, 161 S.W.3d 785, 786 (2004). When the trial court determines that a defendant "has offered sufficient evidence to raise a question of fact concerning a defense, the instructions must fully and fairly declare the law applicable to that defense[.]" *Yocum v. State*, 325 Ark. 180, 190, 925 S.W.2d 385, 390 (1996).

White argues that he had the right to receive the non-model justification instructions that he proposed, reflecting the law as amended by Act 250 of 2021, arguing that the model instruction no longer accurately reflected the legal duty to retreat at the time of his trial in January 2022. *See* Ark. Code Ann. § 5-2-607(b) (Supp. 2021) (providing a person is not required to retreat before using deadly physical force if six enumerated conditions are satisfied).

The jury was given an appropriate instruction by the trial court regarding the law that applied to the self-defense justification, which was based on the law in effect when the offense

11

was committed. The 2021 amendment is not retroactively applicable because the legislature did not expressly provide that it should be applied retroactively. Therefore, the trial court did not abuse its discretion, and we affirm the jury instruction given in court.

## 2. *Argument six*

In his sixth argument on appeal, White asserts that the trial court erred by preventing him from testifying about Burchett's past violent acts. The trial court allowed him to testify about the acts he is now referring to in his argument. During his testimony, White was asked if Burchett ever mentioned killing him. He responded by reiterating his previous testimony about Burchett threatening to "shoot up" his in-laws' house where his daughter resided. The State objected to his response because it was irrelevant to the question asked, and the trial court sustained the objection. Nonetheless, the court made it clear that it would allow the testimony if defense counsel wanted to ask about things Burchett had done to other individuals. Thus, the trial court did not prevent him from testifying about Burchett's past violent acts, and we affirm the trial court's decision.

## 3. *Argument eight*

White's next argument revolves around his entitlement to resentencing based on the standard sentencing range for a Class Y felony. He asserts that he lacked notice of his habitual-offender status and contends that the felony information filed on August 11, 2020, which charged him with first-degree murder, did not include an allegation of habitual-offender status. Furthermore, he claims that the State did not amend the information to include such an allegation.

The requirement for including an habitual offender allegation in the felony information serves the purpose of providing the defendant with notice of the essential elements that the State will rely on when determining the punishment. As stated in *Glaze v. State*, 2011 Ark. 464, at 4, 385 S.W.3d 203, 207, the purpose is to ensure the defendant is informed. In this case, White had actual notice of both his prior convictions and the fact that they would be introduced during the penalty phase of the trial to support an enhanced sentence under the habitual-offender statute. This notice was sufficient to alert White that he could be sentenced as an habitual offender and that his prior convictions would be considered in assessing an enhanced sentence. *Glaze*, 2011 Ark. 464, at 4–5, 385 S.W.3d at 207.

On August 12, 2021, over five months before the trial held on January 24-27, 2022, the State filed a formal notice to include an allegation that White had been previously convicted of four or more felonies. The notice explicitly conveyed the State's intention to try him as an habitual offender and put him on notice that, if convicted, he would be subject to an extended term of imprisonment for the offense charged as outlined in Ark. Code Ann. § 5-4-501(b). Furthermore, at an October 1, 2021, pretrial hearing, the trial court addressed and accepted the State's formal notice regarding the enhancement. However, White did not raise any objections, arguments, or comments concerning the timing, form, or habitual offender allegation itself.

Therefore, since the State's August 12 notice referencing White's original charge–– alleging that he had four or more prior felony convictions, and expressly stating that he was

13

subject to being tried and sentenced as an habitual offender under the applicable range set out in Ark. Code Ann. § 5-4-501(b)--was sufficient to notify him of his habitual-offender status and of the State's intention to pursue enhanced sentencing, we affirm.

### 4. *Argument nine*

White's final argument challenges the trial court's decision to admit two photographs, State's exhibits nos. 34 and 35, depicting law enforcement officers removing the victim's body from the refrigerator. White contends that these photographs were irrelevant and did not shed light on any relevant aspect of the case. Furthermore, he argues that any probative value they may have had was outweighed by the risk of unfair prejudice.

The admission of photographs during a trial is a matter within the discretion of the trial court, and this court will reverse such a decision only if there was an abuse of that discretion. *Collins v. State*, 2020 Ark. 371, at 7, 610 S.W.3d 653, 657. It is generally permissible to admit photographs that are helpful in explaining testimony. *Id.*

Photographs have been deemed admissible to demonstrate the nature and location of wounds to counter a defendant's claim of self-defense or establish intent. *Pearcy v. State*, 2010 Ark. 454, at 9–10, 375 S.W.3d 622, 627. Additionally, photographs may be admitted depicting the condition of the victim's body, the type or location of injuries, or the position in which the body was discovered. *Green v. State*, 2015 Ark. 359, at 3, 471 S.W.3d 200, 202. A trial court's exercise of discretion can also be demonstrated by its careful examination of each photograph before admitting them into evidence. *Pearcy*, 2010 Ark. 454, at 9–10, 375 S.W.3d at 627.

14

Here, the trial court reviewed the photographs in a pretrial hearing, applying relevant rules to assess their relevance and weighing their probative value against any potential prejudicial effect. The court considered several factors, including whether the photographs shed light on any issues, corroborated testimony, aided witness testimony, or depicted the condition of the victim's body and the nature of the injuries. The court reexamined the photographs before admitting them at trial. State's exhibits nos. 34 and 35, which were admitted through Officer Seth Race's testimony, portrayed the location, condition, and position of the victim's body when it was discovered.

These photographs facilitated Officer Race's testimony regarding the details of the discovery and helped the jury understand the testimony better. They also corroborated White's testimony regarding the victim's body placement in the refrigerator. Additionally, as noted by the trial court, the photographs depicted the nature, extent, and location of the victim's wounds and provided different angles and views compared to other admitted photographs of the crime scene.

Therefore, the trial court did not abuse its discretion in admitting the challenged photographs because the photographs were relevant, aided in understanding the testimony, and provided corroboration. As a result, the trial court's decision to admit the photographs is affirmed.

III.    *Conclusion*

We affirm issues four, six, eight, and nine on their merit, and we do not reach issues one, two, three, five, and seven because they are unpreserved.

15

IV. *Rule 4-3(a) Review*

Because White received a sentence of life imprisonment, the record has been reviewed for all errors prejudicial to him, as required by Arkansas Supreme Court Rule 4-3(a). No reversible error was found.

Affirmed.

BAKER, J., concurs.

*Lassiter & Cassinelli*, by: *Michael Kiel Kaiser*, for appellant.

*Tim Griffin*, Att'y Gen., by: *Rachel Kemp*, Sr. Ass't Att'y Gen., for appellee.

16